**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SALLIE HOCK, JASON McCLANAHAN,
CLIFFORD J. FROST, and DARRELL
VICKERS,

      Plaintiffs,

v.

SONJA BUFFA and WARREN CITY
ELECTION COMMISSION,

      Defendants,

      - and -

CONNOR BERDY,

      Intervening Defendant.

_____/

Case No. 19-11785

Hon. Marianne O. Battani

**OPINION AND ORDER DENYING PLAINTIFFS'**
**EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

Plaintiffs Sallie Hock, Jason McClanahan, Clifford J. Frost, and Darrell Vickers

commenced this action in this Court on June 15, 2019, seeking declaratory and

injunctive relief under 42 U.S.C. § 1983 to redress the alleged violation of their rights of

association and to cast effective votes as protected under the First and Fourteenth

Amendments to the U.S. Constitution.  More specifically, the four Plaintiffs are

registered voters in the City of Warren, Michigan, and they assert that based on settled

practice governing past Warren City Council elections and the enforcement of term

limits for City Council candidates, they anticipated being able to vote for four incumbent council members at an upcoming August 6, 2019 primary election.  As a result, however, of a June 11, 2019 decision by the Michigan Supreme Court, the Defendant Warren City Clerk, Sonja Buffa, has been directed to remove Plaintiffs' four preferred candidates from the primary election ballot.  Given the late date of this ruling, it is no longer possible for Plaintiffs to recruit replacement candidates who share their views. Plaintiffs assert that this sudden departure from past practice by Ms. Buffa and her co-Defendant, the Warren City Election Commission (collectively the "Warren Defendants"), has operated to deprive them of their right to associate with the like-minded candidates who have been struck from the ballot, as well as their right to vote for candidates who will best advance their political preferences and values.

Through the present emergency motion accompanying their complaint, Plaintiffs request that the Court enter a preliminary injunction that would enjoin the Warren Defendants from departing from their past practice regarding the enforcement of term limits for City Council members, and would instead direct them to restore the four contested candidates to the ballot for the forthcoming August 6 primary election.[1]  In response, the Warren Defendants take no position on the merits of Plaintiffs' claims or their request for preliminary injunctive relief, but state only that they "acted in good faith" at all relevant times and "only took action consistent with the rulings" of the state courts

---

[1]To be accurate, Plaintiffs' motion seeks the entry of either a temporary restraining order or a preliminary injunction.  In light of the notice given to Defendants and the June 20, 2019 hearing at which all parties, through their counsel, were given an opportunity to address Plaintiffs' motion, the Court need not consider Plaintiffs' request for a temporary restraining order.

that have addressed the issue of term limits for Warren City Council members.  (Dkt. 12, Defendants' Response Br. at 3.)  Plaintiffs do not disagree on this point, but instead acknowledge that the actions taken by the Warren Defendants to remove Plaintiffs' preferred candidates from the primary election ballot were compelled by the recent June 11 ruling of the Michigan Supreme Court.  In light of the parties' consensus on this subject, the Court determined on the record at a June 20, 2019 hearing that the Warren Defendants cannot be subject to liability for the actions they took in accordance with the Michigan Supreme Court's decision.

Apart from the parties named in Plaintiffs' complaint, another Warren City Council candidate whose name appears on the primary ballot, Connor Berdy, has moved to intervene as an additional defendant in this suit.  As discussed in greater detail below, Mr. Berdy commenced the state court litigation that resulted in the above-referenced June 11, 2019 decision by the Michigan Supreme Court.  The other parties to this suit do not oppose Mr. Berdy's request to intervene, so the Court **GRANTS** his motion (Dkt. 9).  Mr. Berdy's motion to intervene was accompanied by a brief in opposition to Plaintiffs' motion for a preliminary injunction.

Plaintiffs' motion has been fully briefed by the parties named in the complaint, as well as Mr. Berdy, and the Court has carefully reviewed these submissions and the record as a whole.  In addition, counsel for the parties (including Mr. Berdy) appeared before the Court on June 20, 2019 and presented arguments on the issues raised in Plaintiffs' motion.  For the reasons set forth below, the Court **DENIES** Plaintiffs' motion for a preliminary injunction.

II.     **FACTUAL AND PROCEDURAL BACKGROUND**

The relevant facts underlying Plaintiffs' claims are undisputed in all material

respects.  Thus, the Court determined at the June 20 hearing that it was unnecessary

for the parties to offer testimony or submit evidence in support of their respective

positions, and the parties agreed that an evidentiary hearing was not warranted.

A.      **The Parties**

Plaintiffs Sallie Hock, Jason McClanahan, Clifford J. Frost, and Darrell Vickers

reside in the City of Warren, Michigan, and each of them is registered to vote in Warren

municipal elections.  Defendant Sonya Buffa is the Warren City Clerk, and the

Defendant Warren City Election Commission is a commission organized under state law

that is responsible for preparing and printing election ballots.  Under Warren's city

charter, the City Clerk is designated the city's chief elections officer, and she has "the

responsibility of making the final determination about the validity of a candidacy."  (Dkt.

1, Complaint at ¶¶ 10, 12.)

B.      **Warren's Past Practice Regarding Term Limits**

In 1998, Warren adopted terms limits for certain municipal officials.  Specifically,

the relevant provision of the Warren city charter states that "[a] person shall not be

eligible to hold the position of city council [member], city clerk or city treasurer for more

than the greater of three (3) complete terms or twelve (12) years in that particular

office."  (Dkt. 2, Plaintiffs' Motion for Preliminary Injunction, Ex. 9, Warren City Charter at § 4.4(d).)[2]

Until 2010, the members of the Warren City Council were at-large officials who represented all city residents.  On November 2, 2010, however, the voters of Warren amended the city charter to create two types of City Council members.  Specifically, the city was divided into five council districts, with one council member elected from each of these districts.  (*See* Warren City Charter at § 5.1(a).)  In addition, two council members were elected "at-large" by the city's voters as a whole.  (*See id.*)  As will become clear, this change in the composition of the City Council had potential implications to the previously enacted three-term or twelve-year limits upon City Council service, because it raised a question as to the meaning of the "particular office" language in the city charter provision that imposed these limits.

Warren's new arrangement of district and at-large council members was in place by the time of the 2011 City Council election.  One candidate who sought election in 2011 as the 3rd District representative, Cecil St. Pierre, had previously served on the Council from 1987 to 2003.  (*See* Complaint at ¶ 16.)  Because St. Pierre had already served more than the 12-year maximum set forth in the city charter, the City Clerk was called upon to determine whether the charter's 12-year limit applied separately to at-large and district-specific positions, or whether council members were limited to 12 years of service in any capacity.  The City Clerk adopted "an election practice of interpreting the three-term (twelve year) limitation . . . as applying [separately] to each

_____

[2]Though not relevant here, this same provision limits the mayor to no "more than the greater of five (5) complete terms or twenty (20) years."  (*Id.*)

type of office," so St. Pierre's name was placed on the ballot for the 3rd District race. (*Id.* at ¶¶ 15-16.)  Likewise, in 2015, St. Pierre again sought to run as a 3rd District council representative, and the City Clerk again agreed that he was eligible and placed his name on the ballot.  (*See id.* at ¶ 17.)  St. Pierre won both the 2011 and 2015 elections, and he is currently serving as the 3rd District representative on the City Council.  (*See id.* at ¶¶ 17, 35 n.3.)

In the meantime, a Warren city resident requested that the city attorney give his opinion on the application of term limits to district and at-large City Council members. On December 26, 2014, the city attorney issued an opinion letter concluding that "At-Large City Council members and District City Council members hold separate and distinct offices within the meaning of the Warren City Charter," and that separate term limits therefore governed these two "offices."  (Plaintiffs' Motion, Ex. 13, City Attorney 12/26/2014 Opinion at 1.)  Thus, the city attorney agreed with the position taken and applied by the City Clerk in the 2011 and 2015 elections.

## C.    The 2015 Court Challenge to Warren's Practices Regarding Term Limits

In April of 2015, a City Council candidate, Lanette Olejniczak, brought a state court suit against the Warren City Clerk and Elections Commission, seeking an order compelling these parties to alter their past practice regarding the application of term limits to City Council members.  Through this suit, Olejniczak sought to strike certain candidates, including St. Pierre, from the 2015 primary election ballot.  In a May 4, 2015 ruling, Macomb County Circuit Court Judge Diane Druzinski declined to enter a preliminary injunction that would award this relief.  (*See* Plaintiffs' Motion, Ex. 15,

6

5/4/2015 Hearing Tr. at 12-16.)  The Michigan Court of Appeals then denied leave to appeal this decision.  (*See* Plaintiffs' Motion, Ex. 16, 6/11/2015 Order.)  Thus, the challenged candidates, including St. Pierre, remained on the 2015 election ballot.

### D. The Forthcoming 2019 City Council Election and Latest Court Challenge to Warren's Term Limit Practices

The primary for this year's City Council election is scheduled for August 6, 2019. The deadline for candidates to submit nominating petitions for City Council positions was April 23, 2019.  (*See* Complaint at ¶ 31.)  Prior to this deadline, St. Pierre filed an affidavit nominating himself for one of the two at-large positions, an office he has not held since Warren voters adopted the city's current at-large and district system for City Council representation.  (*See id.* at ¶ 35 & n.3.)[3]  The other candidates of relevance to this suit who timely filed nominating petitions are:  (i) Robert Boccomino, who seeks election as 5th District representative for the third time, after previously having served one term as an at-large representative, (*see id.* at ¶ 33 & n.1); (ii) Steven Warner, who seeks a third term as 4th District representative, after previously serving one term as an at-large representative, (*see id.* at ¶ 34 & n.2); and (iii) Scott Stevens, who seeks election as 3rd District representative for the first time, after previously having served three terms as an at-large representative, (*see id.* at ¶ 36 & n.4).  In accordance with her office's prior practice, the City Clerk certified that each of these four candidates was eligible for placement on the 2019 primary ballot.

---

[3]As noted earlier, St. Pierre served on the City Council from 1987 to 2003, prior to the 2010 adoption of district and at-large positions.

On May 10, 2019 — after the April 23 filing deadline has passed — a candidate for an at-large City Council position, intervening defendant Connor Berdy, brought suit in the Macomb County Circuit Court, again challenging Warren's practice regarding term limits for City Council members, and requesting that St. Pierre, Boccomino, Warner, and Stevens be removed from the 2019 primary ballot.  In an opinion and order dated May 31, 2019, Macomb County Circuit Court Judge James M. Maceroni granted Berdy's request for a writ of mandamus and a declaratory judgment, and ordered the defendants in that case — including City Clerk Sonya Buffa, the Warren City Election Commission, and Macomb County Clerk Fred Miller — to remove the four challenged candidates from the August 2019 ballot.  (*See* Plaintiffs' Motion, Ex. 17, 5/31/2019 Opinion and Order at 10-11.)

On June 3, 2019, the defendants in the *Berdy* suit filed an application for leave to appeal.  The Michigan Court of Appeals granted this request for leave to appeal, and on June 6, 2019, a three-judge panel issued a 2-1 decision reversing the decision of the Macomb County Circuit Court.  (*See* Plaintiffs' Motion, Ex. 22, 6/6/2019 Michigan Court of Appeals Decision.)  Mr. Berdy, in turn, filed an application with the Michigan Supreme Court for leave to appeal the ruling of the Court of Appeals.  In an order dated June 11, 2019, the Michigan Supreme Court unanimously reversed the Court of Appeals' decision and reinstated the ruling of the Macomb County Circuit Court, adopting the position of "the dissenting Court of Appeals judge that the Warren [City] Charter provides for a single class of city council members [who are] subject to the [Charter's] term limits."  (Plaintiffs' Motion, Ex. 23, 6/11/2019 Michigan Supreme Court Order at 1.)

In light of this ruling, the decision of the Macomb County Circuit Court has been reinstated, including that court's award of mandamus relief directing the City Clerk to remove the four challenged candidates from the August 2019 primary ballot.

This suit followed four days later, on June 15, 2019, with the Plaintiff voters alleging (i) that the Michigan Supreme Court's decision in *Berdy* has brought about a sudden, significant departure from Warren's past election practice regarding term limits for City Council members, and (ii) that, as a result, Plaintiffs have been unfairly deprived of their constitutionally protected rights to associate with candidates who share their political views and to cast their votes in a manner that advances these views.  In support of these claims brought under 42 U.S.C. § 1983, Plaintiffs have submitted declarations stating in pertinent part (i) that they relied on Warren's past election practices as confirming that their preferred candidates would be eligible to run for City Council positions in the 2019 election, and (ii) that if they had known that these practices would be altered as a result of a state court ruling, they would have taken steps to identify eligible replacement candidates who share their political views, or perhaps would have considered entering themselves in the City Council race.  (*See, e.g.,* Plaintiffs' Motion, Ex. 1, Hock Decl. at ¶¶ 6-7.)

## III.   STANDARD OF REVIEW

Through the present motion, Plaintiffs request that the Court enter a temporary restraining order or preliminary injunction that (i) enjoins the Warren Defendants from departing from Warren's past election practices regarding the enforcement of the City Council term limits set forth in the City Charter, and (ii) reinstates the four contested

candidates to the ballot for the upcoming August 6, 2019 primary election.  The decision

whether to award preliminary injunctive relief is governed by a familiar four-part

standard, under which the Court must consider (i) whether Plaintiffs, as the moving

parties, have a strong likelihood of success on the merits, (ii) whether Plaintiffs would

suffer irreparable injury in the absence of injunctive relief, (iii) whether an award of

preliminary injunctive relief would cause substantial harm to others, and (iv) whether the

public interest would be served by the requested award.  *Sandison v. Michigan High*

*School Athletic Association, Inc.,* 64 F.3d 1026, 1030 (6th Cir. 1995).  These four

considerations "are factors to be balanced and not prerequisites that must be satisfied,"

and they "are not meant to be rigid and unbending requirements."  *American Imaging*

*Services, Inc. v. Eagle-Picher Industries, Inc. (In re Eagle-Picher Industries, Inc.),* 963

F.2d 855, 859 (6th Cir. 1992).  "Moreover, a district court is not required to make

specific findings concerning each of the four factors . . . if fewer factors are dispositive of

the issue."  *Jones v. City of Monroe,* 341 F.3d 474, 476 (6th Cir. 2003), *abrogated on*

*other grounds as recognized in Anderson v. City of Blue Ash,* 798 F.3d 338, 357 n.1

(6th Cir. 2015).  As the parties seeking a preliminary injunction, Plaintiffs bear the

burden of establishing that this relief is warranted.  *See McNeilly v. Land,* 684 F.3d 611,

615 (6th Cir. 2012).

## IV.   ANALYSIS

### A.   Likelihood of Success on the Merits

Plaintiffs' claims in this case rest upon the broad and well-established principle

that citizens have a constitutionally protected "right to exercise the franchise in a free

10

and unimpaired manner." *Reynolds v. Sims,* 377 U.S. 533, 561-62, 84 S. Ct. 1362,

1381 (1964); *see also League of Women Voters of Ohio v. Brunner,* 548 F.3d 463, 476

(6th Cir. 2008) (recognizing that "[t]he right to vote is a fundamental right, preservative

of all rights" (internal quotation marks and citations omitted)).  Plaintiffs further point to

the Supreme Court's recognition of "two different, although overlapping, kinds of rights

— the right of individuals to associate for the advancement of political beliefs, and the

right of qualified voters, regardless of their political persuasion, to cast their votes

effectively." *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S. Ct. 5, 10 (1968).  Yet, when

addressing claimed abridgements of these federally guaranteed rights, the federal

courts must be mindful of the principles of federalism that serve as a check on their

authority to scrutinize state or local election practices:

> The Constitution . . . leaves the conduct of state elections to the states.
> The principles of federalism, therefore, limit the power of federal courts to
> intervene in state elections.  Courts have long recognized that not every
> state election dispute implicates federal constitutional rights.  As such,
> only in extraordinary circumstances will a challenge to a state or local
> election rise to the level of a constitutional deprivation.

*Warf v. Board of Elections of Green County,* 619 F.3d 553, 559 (6th Cir. 2010) (internal

quotation marks, alterations, and citations omitted).

As one such extraordinary circumstance in which "the Due Process clause [of the

Fourteenth Amendment] is implicated[] and § 1983 relief is appropriate," the Sixth

Circuit has pointed to the "exceptional case where a state's voting system is

fundamentally unfair."  *Warf,* 619 F.3d at 559 (internal quotation marks and citations

omitted).  More specifically, the court recognized in *Warf* that "due process is implicated

where the entire election process including as part thereof the state's administrative and

judicial corrective process fails on its face to afford fundamental fairness." 619 F.3d at

559 (internal quotation marks and citation omitted). "Such an exceptional case may

arise, for example, if a state employs non-uniform rules, standards and procedures[]

that result in significant disenfranchisement and vote dilution, or significantly departs

from previous state election practice." 619 F.3d at 559 (internal quotation marks and

citations omitted).

In Plaintiffs' view, this case features precisely this sort of "significant departure"

from past election practice that warrants declaratory and injunctive relief. In support of

this assertion, Plaintiffs rely primarily on two decisions cited in *Warf* as examples of

significant departures that justified federal court intervention. First, in *Griffin v. Burns,*

570 F.2d 1065, 1066, 1068 (1st Cir. 1978), the First Circuit addressed claims brought by

a class of absentee voters who sought relief from a state court's post-election ruling that

invalidated the ballots they had cast in a primary election for a seat on the Providence

City Council. The plaintiffs in *Griffin* had cast their votes in this election through shut-in

and absentee ballots, in accordance with (i) the understanding of Rhode Island election

officials that state law authorized the use of such ballots in primaries as well as general

elections, and (ii) past practice allowing this use. *Griffin,* 570 F.2d at 1067. However,

following a primary election decided by just 15 votes, the second-place finisher, Thomas

McCormick, "for the first time questioned the authority of [state election officials] to issue

and count absentee and shut-in ballots in a primary election," and a majority of the

Rhode Island Supreme Court upheld this challenge, ordering that the 123 absentee and

shut-in ballots cast in the election be deemed invalid. 570 F.2d at 1067-68. As a result

of this ruling, the votes were retabulated and McCormick was declared the winner of the primary.

An absentee voter and a shut-in voter then brought suit in federal court under 42 U.S.C. § 1983, seeking relief from the invalidation of their ballots and an order directing state election officials to "schedule a new primary and election in which the ground rules [for absentee and shut-in ballots] were clear." 570 F.2d at 1068-69. The district court awarded this relief and the First Circuit affirmed. In so ruling, the appellate court observed that it was a "close[] question whether what happened here amounted to a constitutional violation entitled to a remedy in a federal court." 570 F.2d at 1075. In particular, the court recognized that two arguments could be made against federal court intervention: "(1) that not counting plaintiffs' votes is the sort of hardship that must be borne as the consequence of the state court's ruling on a disputed legal issue; and (2) that claimed election irregularities of this sort are beyond the ken of a federal court." 570 F.2d at 1075.

Regarding the first of these arguments, the court explained:

[I]t is true that ballots may often be ruled invalid after an election due to innocent illegalities — a misplaced "X" or the like — but this is not that situation. Here neither McCormick nor any other candidate or voter had challenged the absentee or shut-in ballot procedures prior to the primary; the issuance of such ballots followed long-standing practice; and in utilizing such ballots voters were doing no more than following the instructions of the officials charged with running the election. The [state] statute on its face did not prohibit such ballots, and two of the members of the Rhode Island Supreme Court still believe the statute should be read to allow such ballots in a primary — a view which, of course, does not vitiate the majority's ruling, but does underscore the unreasonableness of expecting a voter to have questioned the State Secretary's and other state officials' issuance of the absentee ballots. Government officials who act ultra vires cannot, to be sure, create their own authority. But we do not

13

see how an election conducted under these circumstances can be said to be fair.  When a group of voters are handed ballots by election officials that, unsuspected by all, are invalid, state law may forbid counting the ballots, but the election itself becomes a flawed process.  Given the closeness of the election here, and the fact that the right of suffrage is a fundamental matter, we are unwilling to reject [the voters'] claim merely on the fiction that the[y] had a duty, at their peril, somehow to foresee the ruling of the Rhode Island Supreme Court invalidating their ballots.

570 F.2d at 1075-76 (internal quotation marks, citation, and footnote omitted).

The court then turned to "the second and more difficult question of whether a federal court should intervene to invalidate a local election in this kind of situation."  570 F.2d at 1076.  As a threshold matter, the court observed that "[f]ederal court intervention into the state's conduct of elections for reasons other than racial discrimination has tended, for the most part, to be limited to striking down state laws or rules of general application which improperly restrict or constrict the franchise."  570 F.2d at 1076 (citations omitted).  The courts, in contrast, "have uniformly declined to endorse action under § 1983 with respect to garden variety election irregularities."  570 F.2d at 1076. Nonetheless, the First Circuit reasoned that because "[t]he right to vote remains, at bottom, a federally protected right," it follows that § 1983 relief is warranted "where broad-gauged unfairness permeates an election, even if derived from apparently neutral action."  570 F.2d at 1077.

Applying these standards to the case before it, the court found that an award of relief was appropriate, where (i) the district court was "asked to remedy a broad-gauged unfairness that infected the results of a local election," and (ii) "[a]lmost ten percent of the qualified and voting electorate was, in effect, denied its vote in this close election because [state election officials] advertised, issued, and sanctioned the use of certain

14

ballots which the Rhode Island Supreme Court quashed after the results of the election were in."  570 F.2d at 1078-79.  Against this backdrop, "[t]he district judge could justifiably conclude that the voters . . . would be offended by the cancelling of the ballots notwithstanding their established acceptability."  570 F.2d at 1079.

The second case relied on by Plaintiffs, *Roe v. Alabama,* 43 F.3d 574 (11th Cir. 1995), similarly arose from a post-election state court ruling that invalidated a prior statewide practice for counting absentee ballots.  In *Roe,* the relevant Alabama statute mandated that "a person voting by absentee ballot must execute an affidavit in the presence of a notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older."  43 F.3d at 577 (internal quotation marks and citation omitted).  Under the established "statewide practice prior to the [November 1994] general election," the ballots of absentee voters who failed to properly complete their affidavits "were not counted."  43 F.3d at 578.  Two statewide contests in the 1994 election "were quite close," and following this election, "two individuals who voted absentee, on behalf of themselves and similarly situated absentee voters, filed a complaint in [state court] seeking an order that the contested absentee ballots be counted."  43 F.3d at 578.  The state court granted the requested relief, and another group of voters then brought suit in federal court, seeking an order enjoining Alabama election officials from complying with the state court's ruling.  43 F.3d at 578-79.

The district court held, in pertinent part, that the plaintiff voters had established a violation of their federal rights to due process, and the Eleventh Circuit agreed that the voters had "demonstrated fundamental unfairness in the November [1994] election."  43

F.3d at 580.  In so ruling, the court first observed that "failing to exclude the contested

absentee ballots . . . constitute[s] a post-election departure from previous practice in

Alabama."  43 F.3d at 581.  The court then explained:

> This departure would have two effects that implicate fundamental fairness
> and the propriety of the . . . elections at issue.  First, counting ballots that
> were not previously counted would dilute the votes of those voters who
> met the requirements of [the Alabama absentee ballot statute] as well as
> those voters who actually went to the polls on election day.  Second, the
> change in the rules after the election would have the effect of
> disenfranchising those who would have voted but for the inconvenience
> imposed by the notarization/witness requirement.

43 F.3d at 581.  As for the state election officials' argument that there was no

constitutional violation because "this case presents a case of enfranchisement of those

who cast the contested absentee ballots, rather than a disenfranchisement of qualified

voters," the court disagreed with the premise of this assertion, pointing to the likelihood

that non-voters "would have voted absentee" if they and the candidates had "known that

something less than the signature of two witnesses or a notary . . . would suffice" to

satisfy the legal standards for absentee ballots.  43 F.3d at 581-82 (footnote omitted).

Returning to the present case, Plaintiffs view the decisions in *Griffin* and *Roe* as

establishing a likelihood of success here.  As they observe, in each of these cases — as

well as *Warf,* 619 F.3d at 559-62, in which the Sixth Circuit acknowledged the

"fundamental unfairness" principle recognized in *Griffin* and *Roe,* but held that this

principle did not apply to the case before the court — the "asserted 'significant

departure from previous election practice' was instituted . . . by the state election official

pursuant to an order of a state court."  (Plaintiffs' Motion, Br. in Support at 13.)  Such is

the case here as well, given the Michigan Supreme Court ruling that overturned the

16

established practice of Warren election officials regarding the application of term limits to City Council members.  Moreover, just as the voters in *Griffin* and *Roe* stated that they would have acted differently if they had known prior to the election that the state courts would order a departure from past election practice, Plaintiffs here have identified steps they would have taken to recruit replacement candidates if they had known that their preferred candidates would be removed from the primary ballot.

Under these circumstances, Plaintiffs argue that the same "fundamental unfairness" identified by the courts in *Griffin* and *Roe* also exists here.  Through no fault of their own, Plaintiffs have been deprived of the opportunity to vote for City Council candidates who, under the established practice of the relevant local election officials, would have been eligible to run for City Council positions despite the term limits imposed in the City Charter.  Moreover, by the time Plaintiffs learned of this deprivation, it was too late to mitigate this harm by putting forward replacement candidates.  The result, in Plaintiffs' view, is a flawed and unfair election process that the Court may properly address through an award of appropriate injunctive relief under § 1983.

Yet, despite these admitted similarities between the facts presented here and those at issue in *Griffin* and *Roe,* the cases are dissimilar in other important respects.  Most notably, as a result of the state court ruling in *Griffin*, the ballots cast by the plaintiff voters were discarded, resulting in an outright and irremediable deprivation of the plaintiffs' right to vote in the election at issue.  Likewise, although the state election officials in *Roe* argued that the changed election practices in that case did not result in the disenfranchisement of voters, the court disagreed, reasoning that additional

17

individuals likely would have voted if they had known that election officials would not enforce the rigorous requirements that previously had governed absentee voting.

Here, in contrast, nothing in the Michigan Supreme Court's ruling diminishes the opportunity of the Plaintiff voters to cast their ballots in the upcoming primary. Instead, they have been deprived of an opportunity to vote for one or more preferred candidates who, as it turns out, were not eligible to serve another term on the Warren City Council. Although Plaintiffs speak of a right to cast a meaningful and effective vote for a candidate who shares their political and policy views, this right has its limits. First, the Sixth Circuit has emphasized that "[a] voter has no right to vote for a specific candidate or even a particular class of candidates." *Citizens for Legislative Choice v. Miller,* 144 F.3d 916, 921 (6th Cir. 1998). Moreover, Plaintiffs surely cannot contend that this posited right supplants the authority of state and local election officials to determine the eligibility of candidates. As Plaintiffs concede, they and this Court must accept the Michigan Supreme Court's ruling, as a matter of state and local law, that the term limits set forth in the Warren City Charter apply across-the-board to all City Council positions, whether district or at-large. Given this ruling, Plaintiffs have failed to cite any authority for the proposition that they are constitutionally entitled, as a matter of fairness and due process, to vote for a candidate who is ineligible to serve in the position for which he or she is running. Rather, any diminution of a constitutionally protected right that might have occurred here is far less substantial than the disenfranchisement at issue in *Griffin* and *Roe.*

To be sure, Plaintiffs' claims in this case do not rest solely on the contention that they should have the opportunity to vote for the specific candidates that have been removed from the ballot pursuant to the Michigan Supreme Court's ruling.  Rather, they also complain that they have been deprived of the opportunity to recruit replacement candidates who share their views and will advance their interests as City Council members.  Again, however, this deprivation is only a partial one, and not a total abridgement of the sort that existed in *Griffin* and *Roe.*  In particular, assuming that Plaintiffs are able to identify like-minded candidates before the August 6 primary, they may cast votes for these individuals as write-in candidates and urge their fellow Warren residents to do likewise.  Although this might diminish the likelihood that Plaintiffs' preferred candidates are able to prevail, the constitutionally protected right to vote does not guarantee the success of that vote.

Indeed, because Plaintiffs can show, at most, that the change in Warren's practices for City Council elections diminishes the effectiveness of their votes, and does not jeopardize their underlying right to vote, it is difficult to see how a ruling in their favor can reasonably be limited to facts like those presented here.  It is not uncommon, after all, for a candidate to apply for placement on a ballot, only to learn after the deadline that his application was rejected on one or more grounds — *e.g,* due to a shortfall in valid signatures, or for failure to meet a residency requirement.  In that event, any voter who hoped to cast a ballot for this would-be candidate will be unable to do so, and it will be too late for this and other like-minded voters to put forward a replacement candidate.  Admittedly, the disappointed voter in this hypothetical scenario cannot claim any

reliance on past practice, as Plaintiffs do here, but the resulting injury is the same in either case — namely, a lost opportunity to vote for a preferred candidate, and a corresponding diminished likelihood that a candidate with compatible views will prevail. Nothing in the case law cited by Plaintiffs indicates that such diminished expectations, as opposed to the outright deprivation of a right to vote, rises to the level of a constitutional violation.  It follows that Plaintiffs have not met their burden of establishing a likelihood of success on the merits of their § 1983 claims.

Finally, it bears emphasis that in the many years since *Griffin* and *Roe* were decided (in 1978 and 1995, respectively), no court has applied the "fundamental unfairness" principle recognized in those cases to anything like the situation presented here.  To the contrary, the Second Circuit has observed that in the intervening years since the courts issued these and other decisions finding due process violations in voting cases, the Supreme Court has ruled that "a finding of intentional conduct [i]s a prerequisite for a due process claim."  *Shannon v. Jacobowitz,* 394 F.3d 90, 94 (2d Cir. 2005).  Thus, in the case before it, the Second Circuit reversed a district court's finding of a due process violation in a local election, explaining that "there was no intentional discrimination or deprivation of the right to vote" that could support a federal due process claim.  *Shannon,* 394 F.3d at 96-97.

Likewise, in the present case, Plaintiffs do not allege that their due process rights were violated by virtue of any intentional act by a state or local election official.  To the contrary, Plaintiffs have acknowledged that the Warren Defendants took no action that could be viewed as a bad-faith or intentional effort to deprive Plaintiffs of their

constitutional rights.  Rather, it is clear that the ruling of the Michigan Supreme Court

brought about the harm giving rise to Plaintiffs' claims in this case.  This absence of any

intentional deprivation of Plaintiffs' voting rights by an identified election official provides

an additional basis for concluding that Plaintiffs are unlikely to prevail on the merits of

their § 1983 claims.[4]

## B.    Irreparable Injury

Plaintiffs' claim of irreparable injury is inextricably intertwined with their theory of

constitutional harm.  In particular, they contend that irreparable injury is established by

virtue of their inability, in the absence of injunctive relief, to cast their votes for

candidates who reflect their political views.  Assuming, as Plaintiffs assert, that this

outcome is tantamount to a denial of meaningful access to the ballot, it is clear that such

an abridgement of Plaintiffs' constitutional rights would qualify as irreparable injury.  As

explained, however, the Court questions whether Plaintiffs have properly characterized

the voting injury they have sustained in the wake of the Michigan Supreme Court's

ruling.  In particular, they have not been altogether deprived of their right to vote or their

access to the ballot, but instead have suffered a diminution in the likelihood that their

votes will result in the election of a candidate who shares their political views.  As

previously discussed, there is an absence of authority for the proposition that this

qualifies as a deprivation of a protected constitutional right.  Accordingly, this factor

does not favor an award of preliminary injunctive relief.

---

[4]In light of the Court's conclusion that Plaintiffs have not demonstrated a
likelihood of success on the merits of their claims, the Court need not address the
additional arguments put forward by the intervening defendant on this question.

### C.    Substantial Harm to Others

In Plaintiffs' view, neither the Warren Defendants nor anyone else can possibly face any potential harm through a ruling by this Court that grants more candidates access to the ballot.  This assertion, however, overlooks the harm to (i) other City Council candidates, including intervening defendant Connor Berdy, who now must compete with Plaintiffs' preferred candidates, despite the ruling of the Michigan Supreme Court that these latter candidates are ineligible to serve on the City Council, and (ii) other Warren residents whose votes for eligible candidates would be diluted by the presence of votes for candidates who, according to state and local law as definitively construed by the Michigan Supreme Court, should not be allowed on the ballot.  In addition, Plaintiffs acknowledge that the Warren Defendants and other election officials might incur some additional costs if ordered to print new ballots that include Plaintiffs' preferred candidates, but they suggest that any such costs are minimal as compared to the potential harm to their constitutional rights as voters.  On balance, then, the Court finds that this factor does not tend to support an award of injunctive relief.

### D.    Public Interest

Finally, Plaintiffs state that "it is almost trite to write that the public's interest is always advanced with more choices on the ballot."  (Plaintiffs' Motion, Br. in Support at 22.)  Again, however, Plaintiffs concede that they cannot challenge the Michigan Supreme Court's ruling, as a matter of state and local law, that their preferred candidates are not eligible to serve on the Warren City Council.  It is hardly in the public

interest to insist that the Warren Defendants place candidates on the ballot who are not eligible for the positions they seek.  To the contrary, the public has an interest in seeing that elections are run in accordance with the law.

Moreover, a ruling in Plaintiffs' favor by this Court could fairly be perceived as conflicting with the decision of the Michigan Supreme Court, an outcome that is not in the public interest.  After all, Michigan's highest court has conclusively interpreted the Warren City Charter as prohibiting Plaintiffs' preferred candidates from serving on the City Council beyond their current terms.  Yet, Plaintiffs invite this Court to place the names of these candidates on the upcoming primary election ballot, giving rise to the prospect that these candidates could win the primary and general elections.  Warren residents might well wonder how, by virtue of a ruling of this Court, candidates who are ineligible under the Warren City Charter are nonetheless continuing to serve on their City Council.  It does not serve the public interest for this Court to be viewed as overriding the Michigan Supreme Court on an issue of state and local law — a matter on which, of course, the state's highest court is entitled to have the final word.

In apparent recognition of this concern, Plaintiffs suggested at the June 20 hearing that the Court could award a different sort of relief — namely, reopening the period within which candidates may apply to appear on the primary election ballot.  In Plaintiffs' view, this would offset the claimed unfairness of their present predicament, as they would be able to recruit like-minded candidates to run for City Council, or perhaps decide to run themselves.  Again, however, this alternative remedy serves the public interest only if it is determined that Plaintiffs have, in fact, suffered an abridgement of

their federal constitutional rights.  Otherwise, such relief would merely result in the upcoming primary election being operated under special rules that do not apply to voters and candidates in other elections — or, indeed, to candidates for other positions in this same primary election.  It is not in the public interest to demand that one election alone be held in accordance with rules and practices that do not apply to other elections.  Consequently, it cannot be said that this public interest factor weighs in favor of an award of preliminary injunctive relief.

### E.    Balance of Factors

As explained, most of the relevant factors do not support an award of preliminary injunctive relief in this case.  Most importantly, Plaintiffs have not demonstrated a likelihood of success on the merits.  Next, their claim of irreparable injury depends upon a posited constitutional violation that, in the Court's view, likely did not occur.  In addition, Plaintiffs' requested relief threatens substantial harm to others, and Plaintiffs have not shown that this relief would serve the public interest.  Against this backdrop, the Court declines to award the preliminary injunctive relief sought in Plaintiffs' motion.

## V.      CONCLUSION

For these reasons, the Court **GRANTS** the June 19, 2019 emergency motion to intervene brought by Connor Berdy (Dkt. 9), and **DENIES** Plaintiffs' June 15, 2019 emergency motion for a preliminary injunction (Dkt. 2).

**IT IS SO ORDERED.**

Date: June 21, 2019                           s/Marianne O. Battani
                                                            HON. MARIANNE O. BATTANI
                                                            UNITED STATES DISTRICT JUDGE